# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

SIMPLE GLOBAL, INC.,          )
         )
         Plaintiff/Counterclaim    )
         Defendant,    )
        v.    )  C.A. No. 2018-0809-PAF
         )
DARIUS BANASIK,    )
         )
         Defendant/Counterclaim    )
         Plaintiff.    )
         )

## MEMORANDUM OPINION

Date Submitted: March 4, 2021
Date Decided:  June 24, 2021

Thomas G. Macauley, MACAULEY LLC, Wilmington, Delaware; Attorney for Simple Global, Inc.

Peter K. Schaeffer, Jr., AVENUE LAW, Dover, Delaware; Attorney for Darius Banasik.

**FIORAVANTI, Vice Chancellor**

The narrow issue to be decided in this post-trial opinion is whether Defendant Darius Banasik was validly removed as a director of Plaintiff Simple Global, Inc. ("Simple Global" or the "Company") at a special meeting of stockholders on July 31, 2018. To decide that issue, the court must determine whether the two stockholders that voted to remove Banasik owned a majority of the Company's outstanding common stock on that date. The court concludes that they did and that Banasik was validly removed as director on July 31, 2018.

## I. BACKGROUND

The following recitation reflects the facts as the court finds them after trial.[1]

### A. The Creation of Simple Global

In 2012, Defendant Darius Banasik worked for Logos Logistics, a logistics company based in Michigan and owned by Jonguk "James" Kim.[2] That same year, after obtaining a Master's Degree in Business Administration from the University of Michigan, Banasik and James Kim's brother, Jongik "Justin" Kim[3] decided to form Simple Global, a logistics business for e-commerce.[4] The Company was

---

[1] The trial testimony is cited as "Tr."; deposition testimony is cited as "Dep."; Trial Exhibits are cited as "JX"; and stipulated facts are cited as "PTO", each followed by the relevant page, paragraph, or exhibit number.

[2] Tr. 5-6, 59 (Banasik).

[3] In their briefing and at trial, the parties have referred to Jonguk "James" Kim and Jongik "Justin" Kim as James and Justin, respectively. This Opinion adopts those references. No disrespect is intended.

[4] Tr. 5-7 (Banasik); PTO ¶ II.1.

2

incorporated as a Delaware corporation on October 17, 2012.[5]  On the date of its incorporation, and at all times thereafter, the Company had 5,000,000 authorized shares of common stock.[6]

Banasik and Justin were selected as the Company's original directors on October 19, 2012.[7]  They held their first board meeting on October 24, 2012 at 10:00 a.m. at the Logos Logistics offices in Taylor, Michigan.  The "original"[8] minutes of that meeting reflect that Banasik was elected President of the Company, and Justin was elected Secretary, Chief Financial Officer, and Treasurer.[9]  The original board minutes state that the board authorized the issuance of 4,280,500 shares to Banasik and 719,500 shares to Justin.[10]  The minutes also reflect that based upon that issuance, Banasik owned 85.61% of the Company's equity and Justin owned 14.39% of the equity.[11]  The minutes refer to a "proposed form of Share Certificate to be used by the Corporation" as being attached as Exhibit C, but no form of stock

---

[5] PTO ¶ II.1. The Company is based in New Castle, Delaware. *Id.*

[6] JX A (Certificate of Incorporation); PTO ¶ II.2.

[7] JX B (Resolutions of Incorporator).

[8] The use of the word "original" is intentional.  As will soon be apparent, Justin created subsequent versions of these and other minutes of stockholder and board meetings that reflect the same stock ownership percentages as in the original minutes, but with only 1,000,000 shares outstanding.

[9] JX C-1 at 4.

[10] JX C-1 at 7.

[11] *Id.*

certificate is attached.[12] There is no evidence that any stock certificates were ever issued, and the Company did not maintain a stock ledger.[13] The original October 24, 2012 board minutes contain a signature line for Justin as Secretary, but it is unsigned. There is a separate signature page attached to those minutes containing the signatures of Banasik and Justin as having accepted their appointments as officers.[14]

The Simple Global stockholders also held their first meeting on October 24, 2012.[15] The minutes of that meeting reflect that the meeting began at 10:00 a.m., the same time as the first meeting of the board. The original October 24, 2012 stockholder meeting minutes, signed by Justin, depict the same share holdings and ownership percentages as the original October 24, 2012 board meeting minutes. Those same share holdings and ownership percentages are recited in the original minutes of the following year's stockholders meeting dated March 21, 2013.[16]

Shortly after forming the Company, Banasik left Michigan and established the Company's operations at a warehouse in New Castle, Delaware.[17] Justin departed for Korea where he owned and operated a software company called IMEX.[18] Simple

---

[12] *Id.* at 3.

[13] Tr. 34 (Banasik); Tr. 93 (Justin).

[14] JX C-1 at 9.

[15] JX C at 1.

[16] JX D at 2.

[17] Tr. 7 (Banasik).

[18] Tr. 123-24 (Justin).

4

Global and Logos Logistics were IMEX clients.[19]  Justin devoted half of his time to Simple Global.[20]

### B. Banasik and James Enter into a Loan Agreement.

Banasik and James entered into a one-page "Personal Loan Contract," dated March 21, 2013 (the "PLC").[21]  The PLC bears the same date as the annual meetings of the Simple Global board and stockholders that year.[22]  Banasik drafted the PLC.[23]  The terms of the PLC provide for James to make an interest-free loan of $50,000 to Banasik, with repayment due on or before May 30, 2015.  The PLC provides that James "has the right to ask for loan repayment in Simple Global, Inc. common stock and agrees that 828,948 shares of common stock will be sufficient compensation for the loan.  This common stock is owned by Darius Banasik as of this date."[24]

The PLC also contains representations about the Company's then-current equity structure and an illustrative post-repayment equity structure that is entirely inconsistent with the figures stated in the Company's original 2012 and 2013 board

---

[19] Tr. 124 (Justin); Tr. 133-34 (James).

[20] Tr. 123 (Justin).

[21] JX E.

[22] JX D.

[23] Tr. 127 (Justin); Tr. 139 (James).

[24] JX E.  Banasik claims that the agreement gave Banasik the option to repay in cash or stock.  Tr. 30 (Banasik); *see also id.* 60 (Banasik) ("This agreement allows me the right to repay James Kim with stock.").

and stockholder meeting minutes. The PLC states that there were 2,000,000 "total Simple Global Shares Authorized and Allocated," and that Banasik owned 1,219,280 shares, with a stated ownership percentage of 61%. The PLC next provides the following illustration:

Simple Global Equity – Post Loan Repayment

**<u>Darius Banasik, Post Repayment</u>**

| | |
|---|---|
| Shares Remaining | 390,332 |
| Percent Ownership | 19.52% |

**<u>Jonguk (James) Kim, Post Repayment</u>**

| | |
|---|---|
| Shares Remaining | 828,948 |
| Percent Ownership | 41.45% |

**<u>Jongik (Justin) Kim, Post Repayment (UNCHANGED)</u>**

| | |
|---|---|
| Shares [R]emaining | 780,720 |
| Percent Ownership | 39.04% |

James and Banasik signed the PLC.[25] Immediately above the signature blocks, the PLC states: "By signing below, all parties are in agreement on the terms stated above."[26]

On the same day that Banasik entered into the PLC, he entered into a separate Personal Loan Contract with the Company (the "Banasik Loan").[27] The Banasik

---

[25] JX E; Tr. 30 (Banasik).

[26] JX E.

[27] JX F.

Loan is a one-page document, which Banasik executed both in his personal capacity and as co-Founder and CEO of the Company.[28] The terms of the Banasik Loan are similar to those of the PLC: (a) $50,000 loan, interest free; (b) loan repayment to take place on or before May 30, 2015; (c) the lender (Banasik) has the right to repayment in Simple Global common stock; and (d) 828,948 shares "will be sufficient compensation for the loan."[29] The Banasik Loan required delivery of the loan amount to the Company by September 1, 2013. James and Justin testified that they were unaware that Banasik had entered into this loan with the Company,[30] and there is no evidence that the board authorized the Company to enter into the Banasik Loan. There is no dispute, however, that Banasik deposited $50,000 into the Company's bank account in July 2013.[31]

According to minutes of the Company's March 21, 2014 stockholders meeting, the Company's stock ownership was as follows:[32]

| Name | % of Ownership | Share Owned |
|---|---|---|
| Jonguk (James) Kim | 66.09% | 3,304,509 |
| Darius Banasik | 19.52% | 975,911 |
| Jongik (Justin) Kim | 14.39% | 719,580 |

---

[28] *Id.*

[29] *Id.*

[30] Tr. 109 (Justin); Tr. 159 (James).

[31] *See* JX G (image of a $50,000 check from Banasik's personal account payable to the Company and showing a deposit on July 19, 2013); JX H (Simple Global bank statement showing a $50,000 deposit on July 19, 2013).

[32] JX I at 2.

7

The minutes indicate that Banasik called the meeting to order as President and that all three stockholders were present. The minutes also state: "The chairman noted 3,304,509 shares of Darius Banasik was transferred to [James] by converting loan amount of $50,000 to shares."[33] The minutes do not identify the "chairman," but Banasik acknowledges that the chairman "appears to have been Banasik at that point."[34] The minutes are signed by Justin as Secretary.[35] Banasik denies that any meeting of the board or stockholders occurred on March 21, 2014.[36]

On September 14, 2015, Banasik sent a one-sentence email to James and Justin stating simply: "The conversion happened on 3/21/14."[37] Banasik wrote in the subject line: "Personal Loan Agreement & Cap Table that includes Transfer."[38] Banasik testified "[t]he only conversion that it could have been referring to would be that of the [PLC] and subsequently my loan agreement thereafter.[39] But Banasik later admitted that he has never been repaid on the Banasik Loan in either cash or Simple Global stock.[40] Therefore, the only conversion to which Banasik's

---

[33] *Id.*

[34] Def.'s Post-Tr. Opening Br. 19.

[35] *Id*.

[36] Tr. 39 (Banasik) ("This meeting didn't take place.").

[37] JX J-1

[38] *Id*.

[39] Tr. 42 (Banasik).

[40] Tr. 42 (Banasik).

8

September 14, 2015 email could have referred was the conversion of James's PLC debt into Simple Global stock held by Banasik.

The documentary record, including emails from Banasik to James, Justin, and third parties is consistent with Banasik's having transferred a majority of his Simple Global stock to James in repayment of the PLC on March 21, 2014. First, the Company's federal tax return for 2015,[41] which Banasik signed as President under penalty of perjury on September 15, 2016,[42] stated that Banasik owned 19.52% of the Company's common stock.[43] Second, Banasik sent an email to Citizens Bank on January 31, 2017 in connection with the Company's application for a line of credit, stating: "Since I am a 19.52% shareholder, I have not been asked to provide this information previously. Moreover, since I am under the 20% threshold I will not be signing as a guarantor. A separate email will be going out to introduce you to Jonguk (James) Kim with the information you requested and he will get the information to you directly."[44] Third, Banasik sent an email to James that same day, forwarding the loan application and copying Citizens Bank, stating: "Hi James, Per our discussion we are in the process of obtaining a line of credit from Citizen's Bank.

---

[41] JX J-2.

[42] JX J-3.

[43] JX J-2 at 6 & 14.

[44] JX J-4.

9

Due to your majority shareholder status, Citizen will require the following information: . . ."[45]

Banasik tried to avoid the import of his own emails with a story that is simply incredible. According to Banasik, the PLC was a document that contemplated a future stock issuance by the Company.[46] That story is belied by Banasik's own trial testimony that the PLC was a private contract between him and James.[47] As to the federal tax return, Banasik testified he did not know whether he signed the authorization form before he reviewed the return, and even if he did, he said his "review of the tax returns were around the concept of revenue, expense, income, and taxable income."[48] Banasik disagrees with the IRS schedule that listed his ownership at 19.52%.[49]

---

[45] JX J-5.

[46] Tr. 83-84 (Banasik).

[47] Tr. 32 (Banasik).

[48] Tr. 66 (Banasik).

[49] Tr. 44 (Banasik). Banasik argues that the Company objected to and did not produce copies of its tax returns for other years and, therefore, the court should draw an adverse inference that they would contradict the 2015 tax return's statement of his stock ownership. I decline to do so. Banasik could have moved to compel the production of the tax returns for other years and did not do so. Furthermore, Banasik was the President and/or CEO until his removal in 2018 and the Company objected to producing additional years of returns because Banasik was responsible for communicating with the Company's accountant and signing the tax return, and presumably possessed or had the ability to obtain them. Banasik did not raise this issue in the pretrial order.

Banasik's explanation for his representations to Citizens Bank is even less credible than his explanation concerning the tax return. Banasik claims the Citizens Bank loan was a loan to fund the Company's "Korean entity." Banasik testified that the Citizens Bank loan was:

> part of the larger agreement that we had made with James and Justin regarding the Korean entity, the agreement being that the Korean entity was in need of money and we would secure some financing for this entity with a combination of things. And the first thing would be the collateral of Simple Global's accounts receivable. That collateral would be used as an asset towards this financing, as well as James' personal guarantee of the $600,000 line of credit.
>
> The intention here was that this money was to be used for the Korean entity. There were all of these irregularities with the Korean entity. There were, you know, all these -- the money laundering accusations, the tax avoidance accusations, and I wanted nothing to do with any of that. And the intent here was to secure this line of credit under the Korean entity, which I was a minority shareholder of.[50]

Banasik's entire testimony on this issue lacks any documentary support. There are no documents even suggesting that the Company had a Korean subsidiary or any subsidiary at all. Banasik offered no evidence of any equity ownership in such an entity. Nor are there any documents in the record supporting Banasik's allegations of money laundering or tax avoidance. Beyond lacking documentary support, Banasik's testimony at trial was unconvincing and vague. Banasik's testimony does not jibe with the tax return that he signed under penalty of perjury as

---

[50] Tr. 45–46 (Banasik).

Simple Global's President and his communications to Citizens Bank, which clearly and unequivocally represented that Banasik was a 19.52% stockholder of Simple Global. And if all of that were not enough, Banasik told James, in connection with the Company's loan application, that James was the "majority shareholder."[51]

## C.    The Mystery of the Minutes and the Outstanding Shares

In or around early 2017, Simple Global sought to obtain additional funds. The directors and stockholders pursued two sources: (1) the above-discussed bank loan; and (2) additional equity investment. Justin testified that he, James, and Banasik were concerned that various documents, including the PLC, created ambiguity about the Company's capital structure, which could create problems in trying to raise additional capital. Thus, at a 2017 meeting in Michigan, James, Justin, and Banasik agreed to reduce the number of outstanding shares from 5,000,000 to 1,000,000, and adjust each stockholder's holdings in a proportional amount. In Justin's words:

> So on 2017, sometime 2017, we decided to do the fundraising, and then the number of the shares somehow was not consistent. Like, some were saying 5 million, some were saying 2 million, so -- and also everything was on the percentage, not the actual number of shares. So we decided to make it easier for the investors. Let's change to 1 million. So we all agreed that, you know, [unintelligible] we sat, like, together in the room, and then we all said, Let's change it to 1 million.[52]

---

[51] JX J-5.

[52] Tr. 94 (Justin); *see also* Tr. 165 (James) ("We end up to agree let's start from 1 million. That's why Darius, if you see his cap table proposal, he put 1 million.").

12

As noted earlier in this opinion, there are different versions of signed board and stockholder meeting minutes, dating back to the Company's inception. The minutes are nearly identical in all respects,[53] with the exception being the number of shares held by each of James, Justin, and Banasik. The "original" minutes of the board and/or stockholder meetings of October 24, 2012,[54] March 21, 2013,[55] and March 21, 2014[56] all reflect that 5,000,000 shares were issued and outstanding.[57] The "new" minutes, as I refer to them, show 1,000,000 shares issued and outstanding. Although the number of shares held by each of the three stockholders is different, their percentage ownership as stated in the new minutes is identical to what is represented in the original minutes.[58]

Justin, the corporate secretary and drafter of those minutes, offered a simple and credible explanation that solved the duplicate-meeting-minute mystery. After the 2017 agreement to reduce the number of issued and outstanding shares to 1,000,000, Justin created new minutes from the originals that were on his computer:

---

[53] The "new" minutes of the October 24, 2012 stockholders meeting contains a resolution electing James, Justin, and Banasik as directors. *See* JX C-2. The original minutes of that meeting contain no such resolution. *See* JX C.

[54] JX C; JX C-1 at 7.

[55] JX D at 2.

[56] JX I at 2.

[57] JX C-2 and C-3 at 6; JX D-1 at 2; JX J at 2.

[58] There are no board or stockholders meeting minutes from 2015 or 2016.

13

So I have the old Word document in my file. So I just, you know, pulled it out and then changed the number of the shares. And that's all I changed, from old document to new document.[59]

The decision to reduce the number of issued and outstanding shares from 5,000,000 to 1,000,000 is not reflected in any formal board or stockholder resolution or written consents. Nevertheless, it is entirely consistent with the documentary evidence, including an email that Banasik sent to James and Justin on June 8, 2017, which stated the following:

Hi James/Justin,
I know that with this new fundraising round we still need to clean up the CAP table and % allocations. We should do this between us to make sure everything is documented and clear for any outside investor that would be looking in.[60]

Banasik's June 8, 2017 email attached a table depicting share holdings at prior points in time. Notably, under a column entitled "Initial Ownership," the table reflects 1,000,000 shares initially outstanding, with Banasik holding 856,100 shares, Justin holding 143,900 shares, and James holding no shares.[61] The table then displays share holdings on March 21, 2014 based on "Debt to Equity Conversion," with James owning 660,902 shares, Justin owning 143,916 shares, and Banasik

---

[59] Tr. 95 (Justin).

[60] JX J-6.

[61] *Id.* The table contains a typographical error indicating that the shares listed were owned on March 21, 2012, because the Company was incorporated on October 17, 2012. PTO ¶ II.1.

14

owning 195,182 shares. The rest of the table shows share holdings on December 31, 2014, 2015, and 2016 after conversion of accounts payable and loans into equity[62] and the issuance of performance shares to Banasik and his brother. Notably, even under Banasik's calculations as of December 31, 2016, James would be the Company's majority stockholder, with 57.47% of the total 1,232,137 shares outstanding.

At trial, Banasik gave contradictory testimony about the capitalization table attached to his June 8, 2017 email. On direct examination he testified that it had "no relevance to the ownership and control of Simple Global."[63] Yet on cross-examination, he testified that the document was his proposal "to issue additional equity in Simple Global to account for the Korean operations."[64]

The Company held its 2017 annual meeting of stockholders on July 6, 2017. The minutes of the meeting state that James was the chairman of the Company.[65]

---

[62] In his post-trial briefing, Banasik claims the table's references to the conversion of accounts payable and loans into equity issuances to IMEX and Logos Logistics are references to the "Korean entity" that he says is the subsidiary about which all of the equity ownership calculations in the documentary record refer. *See* Def.'s Post-Tr. Reply Br. 9–10. That story, which is inconsistent with the documentary record and was raised for the first time at trial, is incredible. Furthermore, IMEX is owned by Justin, and Logos Logistics is owned by James. There is no evidence that Simple Global or Banasik had any ownership interest in either of those entities.

[63] Tr. 49 (Banasik).

[64] Tr. 74 (Banasik); *see also id.* at 75 (Banasik) (Q: "We're talking about equity in Simple Global. Are we clear on that? A: "Yes. This is for additional equity.").

[65] JX K.

The minutes, which were digitally signed using DocuSign[66] by each of James, Justin, and Banasik, contain the following resolution:

> RESOLVED, that all shareholders agree and approve all of the transactions related to the deferred compensation for Jonguk Kim, Jongik Kim, and Darius Banasik and equity convert related thereto occurred from 2012 to 2016. All shareholders agree that the shares of ownership as of the end of the year 2016 as presented below by reflecting all of the transactions related with the deferred compensation and equity convert.[67]

| Name | % of Ownership | Shares Owned |
|---|---|---|
| Darius Banasik | 26% | |
| Jongik (Justin) Kim | 15% | |
| Jonguk (James) Kim | 59% | |

Justin testified that he believed that he left the "Shares Owned" column blank because there was "some conflict" with the numbers that were in Banasik's June 8, 2017 table, but they "all agree[d] on the percentage of the shares at that time."[68] Despite his DocuSign signature on the July 6, 2017 board minutes that refer to his

---

[66] DocuSign is an electronic signature service that allows parties to enter into written contracts. *See IO Moonwalkers, Inc. v. Banc of Am. Merch. Servs., LLC*, 814 S.E.2d 583 (N.C. Ct. App. 2018). "DocuSign gives each [agreement] an identifying number, which then appears on each page of the document. DocuSign sends an email with an electronic link to a copy of the agreement. Through DocuSign, the party viewing the contract can sign it using a digital signature. DocuSign tracks the date and time when the contract is sent, viewed, and signed by each party." *Id.* at 619–20.

[67] JX K.

[68] Tr. 104 (Justin).

owning 26% of the Company's outstanding stock, Banasik tried to cast doubt as to whether he signed the minutes. He testified that the Company had one DocuSign account which was tied to his email account and that "everybody had access to" it.[69] He did not deny authorizing his signature on the July 6, 2017 minutes, but testified that he "d[id] not remember authorizing my signature to this particular document."[70] Yet Banasik admitted to sending the July 6, 2017 stockholder meeting minutes containing his signature to Citizens Bank on May 14, 2018 in connection with seeking a line of credit for the Company.[71] In his email to Citizens Bank, Banasik wrote: "I wanted to share with you are [sic] cap table as well as my tax returns for the line of credit extension. . . . The Docusign agreement shows the share percentages."[72] The "Docusign agreement" refers to the July 6, 2017 stockholder meeting minutes, showing Banasik owning 26% of the Company's outstanding stock, and James and Justin collectively owning 74%.[73]

The board, consisting of Banasik, James, and Justin, met immediately after the stockholders meeting on July 6, 2017. The minutes of that meeting contain several board resolutions, but none of them concern the issuance of stock or the

---

[69] Tr. 51-52 (Banasik).

[70] Tr. 52 (Banasik).

[71] Tr. 53 (Banasik); JX K-3.

[72] JX K-3 at 1.

[73] *Id.* at 5–6.

17

reduction or increase in the number of authorized shares.[74] The board meeting minutes also do not indicate the number of shares outstanding or the number of shares held by any stockholder of the Company. According to the board meeting minutes, the board elected officers "to serve for the ensuing year and until their successors are elected and qualified," which included Banasik as Chief Executive Officer.[75]

In a July 9, 2017 email to James and Justin, Banasik wrote that "we have decided to settle on new percentages as follows: Darius 26% Justin 15% James 59%"[76] These percentages are consistent with the July 6, 2017 stockholders meeting minutes, but neither the meeting minutes nor Banasik's July 9, 2017 email indicated the number of shares that each stockholder owned. Banasik also wrote: "We will have to check on how to incorporate these into minutes so as to minimize tax implications."[77]

On March 23, 2018, Banasik sent an email to the Company's accountant, copying James and Justin, and attaching an "updated Cap table."[78] Banasik's email also indicated that it was being sent to the bank that was assisting the Company in

---

[74] *Id.* at 2–4.

[75] *Id*. at 2.

[76] JX K-1.

[77] *Id*.

[78] JX K-2.

fundraising.[79] The attached capitalization table depicted the same ownership percentages as was represented in the July 6, 2017 stockholders meeting minutes and Banasik's July 9, 2017 email, but the March 23, 2018 capitalization table showed that an additional 120,150 shares had been issued in 2015:  96,039 to Banasik and 24,111 to Justin.[80] Thus, the total number of outstanding shares was purported to be 1,120,150.

### D. Banasik Is Removed as an Officer and Director

At a special meeting of the board on June 18, 2018, Banasik was removed as the Company's CEO.[81] Banasik did not contest his removal as an officer at that time, and he does not contest his removal as an officer in this action.

The Company held its annual stockholders meeting on July 9, 2018.  The minutes of that meeting, signed by Justin as Secretary, indicate that only James and Justin attended.[82]  According to the minutes, there were 1,000,000 shares outstanding, with James owning 66.09% and Justin owning 14.39%.  The minutes state that the stockholders elected James, Justin, Banasik, and Nishi Mohen as

---

[79] *Id.*; Tr. 73 (Banasik).

[80] JX K-2.

[81] PTO ¶ II.6.  There are no minutes of a June 18, 2018 board meeting in the record.  There are, however, minutes of an August 7, 2018 board meeting, indicating that the CEO had been previously terminated and that, in lieu of electing a new Chief Executive Officer, the board elected James to serve as President and Treasurer and Justin to serve as Secretary. JX N.

[82] JX L.

directors "to serve until the next annual meeting of Shareholders and until their successors are duly elected and qualify."[83]  The minutes refer to a discussion about the Company's financial struggles and a resolution authorizing the board to offer convertible debt or equity to potential investors.[84]

Just three weeks after the 2018 annual stockholders meeting, James, as Chairman, called a special meeting of stockholders on July 31, 2018, which convened at 10:00 a.m. as a "[c]onference call by internet access."[85]  The minutes of that meeting state that James, Justin, and Banasik, collectively owning 100% of the outstanding stock, attended.

According to the July 31, 2018 stockholders meeting minutes, the stockholders adopted two resolutions.  The first resolution approved the sale of "new shares [to] be sold to the current shareholder [sic] in proportion to the percentage of shares they currently own in the Corporation."[86]  The resolution provided that any shares that remained unsubscribed by August 15, 2018 could be purchased by any of the other stockholders that had fully subscribed to the offering.  According to the minutes, James and Justin voted in favor of the resolution, and Banasik voted against

---

[83] *Id.*

[84] *Id.*

[85] JX M.  The minutes state that the stockholders meeting was held "[r]ight after the meeting of the board of directors,"[85] but there are no minutes of a July 31, 2018 board meeting in the trial record.

[86] *Id.*

it. The second resolution was "to re-elect the directors" consisting of Nishi Mohan,[87] James, and Justin. That resolution was also approved with James and Justin voting in favor and Banasik voting no.[88] The stockholders meeting minutes do not indicate a vote having been taken to remove Banasik as a director, but the parties have stipulated that Banasik was removed as a director at this meeting.[89]

### E.     The Company Issues Additional Shares

On August 1, 2018, James sent an email to the stockholders and directors attaching a subscription agreement to purchase Simple Global common stock for $0.30 per share. The email stated, in pertinent part, "Through the meeting of shareholders and board of directors held on July 31, 2018, Simple Global is approved and authorized to offers [sic] for all shareholders to subscribe to purchase the new issued shares at $0.30 per share by ownership percentage in order to increase $1,000,000 of the working capital for immediate cash injection . . . ."[90] The form of subscription agreement was not mentioned in or attached to the minutes of the July 31, 2018 stockholder meeting minutes, and the resolution in those minutes

---

[87] Nishi Mohan's name is spelled differently in the July 9, 2018 stockholders meeting minutes as compared to the spelling of his name in the July 31, 2018 stockholders meeting minutes. *Compare* JX L (spelling the name as "Nishi Mohen"), *with* JX M (spelling the name as "Nishi Mohan"). It is not clear from the record which spelling is accurate. No disrespect is intended.

[88] *Id.*

[89] PTO ¶ II.8.

[90] JX M-1.

authorizing the sale of shares does not recite any of the price terms. James's August 1, 2018 email also attached a capitalization table, showing 1,120,150 shares outstanding (which was inconsistent with the minutes of the July 8, 2018 stockholders meeting), and that 3,333,333 shares were being made available for purchase in the offering.[91] The table also indicated each stockholder's allotted number of shares available for purchase in the offering.

James executed a subscription agreement on August 1, 2018 to purchase all 1,966,701 shares available to him in the offering, for a total purchase price of $590,000.[92] James was the only stockholder to subscribe to the offering. On August 21, 2018, James executed another subscription agreement to acquire the remaining 1,366,632 unsubscribed shares for a total purchase price of $410,000.[93] Thus, accounting for all of the shares sold in the August 2018 offering, the Company reports that there were 5,000,000 authorized shares, with 4,453,483 shares issued and outstanding as of August 23, 2018.[94]

According to the Company's capitalization table, as of August 22, 2018, James owned 3,994,233 shares (89.69% of the outstanding shares), Banasik owned

---

[91] JX M-2 at 6.

[92] JX M-2.

[93] JX O.

[94] JX P.

291,239 shares (6.54% of the outstanding shares), and Justin owned 168,011 shares (3.77% of the outstanding shares).[95]

## F. The Litigation

On November 7, 2018, Simple Global filed a verified complaint against Banasik for breach of fiduciary duty owed to Company and for conversion and waste of corporate assets.[96] On April 1, 2019, Banasik answered the complaint and filed a counterclaim challenging his removal under 8 *Del. C.* § 225.[97] He admitted that he only raised the counterclaim in response to the Company's complaint against him.[98] Along with his answer and counterclaim, Banasik filed a third-party complaint against Justin and James alleging misappropriation and waste of corporate assets, and breach of the duty of good faith and fair dealing.[99]

On March 23, 2020, after briefing and oral argument on the Company's motion to dismiss Banasik's counterclaim and third-party complaint, the court dismissed all of Banasik's third-party claims against James and Justin. The court severed the Section 225 counterclaim challenging Banasik's removal as a director

---

[95] *Id.*

[96] Dkt. 1.

[97] Dkt. 13.

[98] Tr. 15-16 (Banasik)

[99] Dkt. 13.

from the plenary action and directed the parties to proceed with discovery and trial on the counterclaim.

Trial on the Section 225 claim was conducted remotely via Zoom technology on September 2, 2020. After post-trial briefing and argument, the parties submitted supplemental briefing on the Company's submission of the new minutes of the March 21, 2013 stockholders meeting from the minute book.[100] The one-page document reflects a total of 1,000,000 outstanding shares, with Banasik owning 865,100 and Justin owning 143,900, and the signatures appearing on the same page.[101] Following post-trial argument, the Company offered what it contends is the hand-signed version of JX D-1 at 2 from the minute book to refute Banasik's trial testimony that he "did not sign this document"[102] even though it bears his signature.

---

[100] Justin signed twice—in his capacity as Secretary and as a stockholder. Banasik's signature is sandwiched between Justin's signatures. All three signatures are in black ink, but Banasik continues to question the authenticity of his signature. *See* Dkt. 60.

[101] The new minutes from other meetings also contain signature pages with Banasik's signature, but the signatures do not appear on the same page as the purported share holdings.

[102] Tr. 68 (Banasik). Upon questioning from the court, Banasik at first seemed equivocal, but was then emphatic that he did not sign the document:

> THE COURT: So is it your testimony that the signature was – this document is forged?
> THE WITNESS: I – I don't know when this document was filled out and how these signatures got onto it, Your Honor. I don't know. I cannot say. I did not sign this document.
> THE COURT: You cannot say that you did not sign it?
> THE WITNESS: No. I did not sign this document.

Tr. 89 (Banasik).

The court has reviewed the hand-signed version from the minute book. For purposes of this opinion, the court need not decide the admissibility or authenticity of Banasik's signature on that document. Nevertheless, a finding that Banasik signed the new minutes of the March 21, 2013 stockholders meeting would be entirely consistent with the documentary record and the testimony of Justin and James.

## II.    ANALYSIS

### A.    Section 225 and Scope of this Proceeding

Under Section 225 of the Delaware General Corporation Law ("DGCL"), "[u]pon application of any stockholder or director . . . whose title to office is contested, the Court of Chancery may hear and determine the validity of any election, appointment, removal or resignation of any director or officer of any corporation . . . ." 8 *Del. C.* § 225(a). Section 225 is typically utilized to resolve election disputes, including the removal of officers and directors of Delaware corporations, on an accelerated basis. *In re Data Processing Consultants, Ltd.*, 1987 WL 25360, at *5 (Del. Ch. Nov. 25, 1987). This case has been anything but accelerated. Banasik did not assert his Section 225 claim until eight months after his removal and did not press it. The record shows that Banasik is not so much motivated to resume his position as a director, but rather to undermine the authority of James and Justin to institute the Company's claims against him. As Banasik testified at trial: "I walked away from what was essentially a company that wasn't

25

worth anything and . . . said, you know, this isn't working for me. I said, I'm leaving . . . . I went to Asia on vacation, and then, all of a sudden, I received . . . a lawsuit from Simple Global that says that, you know, James and Justin are now suing me, that my company is now suing me."[103]

Banasik contends that he owns a majority of the Company's outstanding stock and, therefore, his removal as a director was invalid. Under Delaware law, "[a]ny director . . . may be removed, with or without cause, by the holders of a majority of the shares then entitled to vote at an election of directors" except in circumstances not applicable here. 8 *Del. C.* § 141(k). Thus, the central issue in this case is whether Banasik held a majority of the Company's outstanding stock on July 31, 2018.

Section 227 of the DGCL empowers this court, in any proceeding under Section 225, to "determine the right and power of persons claiming to own stock to vote at any meeting of the stockholders." 8 *Del. C.* § 227(a). In exercising that power, "the court may determine any legal or factual issue, the resolution of which could affect the outcome of a corporate election or of any other stockholder vote. That includes deciding beneficial ownership." *Zohar II 2005-1, Ltd. v. FSAR Hldgs., Inc.*, 2017 WL 5956877, at *25 (Del. Ch. Nov. 30, 2017) (internal quotations

---

[103] Tr. 15 (Banasik); *see also* Dkt. 13 (Answer and Counterclaims (Lack of Standing Defense) (contending the Company's claims against Banasik are "barred because [the Company] was not duly authorized by a majority in interest of its shareholders and directors to bring this suit against Defendant, pursuant to [the Company's] corporate bylaws")).

omitted); *accord In re Hawk Sys., Inc.*, 2019 WL 4187452, at *6 (Del. Ch. Sept. 4, 2019).

The parties have not engaged directly on whether the court may resolve the dispute over actual share ownership of Simple Global in this proceeding. Generally, the court's authority in a Section 225 proceeding is narrow, and it should not inject issues purely collateral to the determination of a disputed election. *Genger v. TR Investors, LLC*, 26 A.3d 180, 199 & n.83 (Del. 2011). Nevertheless, issues concerning stock ownership may necessarily need to be determined. As the court noted in *Byrne v. Lord*, 1996 WL 361503 (Del. Ch. June 11, 1996), in determining who has the right to vote stock in the context of a Section 225 proceeding, the court should also determine who owns it, but a question of ownership "is not binding on the owner unless the owner is served with process and made a part of the Section 225 proceeding." *Id*. at *2; *see Zohar*, 2017 WL 5956877, at *24–26 (analyzing the history of Section 225, case law, and the court's authority to determine stock ownership in a Section 225 proceeding).

In this case, at least as of August 31, 2018, James, Justin, and Banasik were the only stockholders of the Company.[104] James and Justin were joined as defendants in Banasik's third-party complaint and were served with process. All

---

[104] JX M; *see also* JX K, JX K-1, JX K-2, JX K-3, JX L.

27

claims against James and Justin in the third-party complaint, however, were dismissed on March 23, 2020.[105] James and Justin, as directors of the Company, are presumably directing the Company's defense. They also testified at trial. Nevertheless, they were not individually represented by counsel at trial. In addition, the Company's requested relief is limited to a determination that "Banasik is not the majority shareholder of [Simple Global], and that the Company's shareholders properly removed Banasik as a [Simple Global] director at a special shareholders' meeting on July 31, 2018." PTO § IV.B. As discussed below, the court does not need to decide the precise number of shares held by James, Justin, and Banasik to determine whether Banasik was validly removed. The court need only determine whether James and Justin collectively had sufficient votes to remove Banasik. *See, e.g., Boris v. Schaheen*, 2013 WL 6331287, at *3 (Del. Ch. Dec. 2, 2013) (declining to decide in a Section 225 action whether certain shares had been validly issued because, regardless of that outcome, the plaintiffs would have owned a majority of the outstanding shares).

---

[105] Dkt. 31.

28

## B. Banasik's Removal as a Director

The parties have stipulated that "Banasik was removed as a [Simple Global] director at the special shareholders' meeting on July 31, 2018."[106] This stipulated fact is "admitted by the parties and require[s] no proof."[107] The court construes this stipulated fact to mean that the Simple Global stockholders considered and voted upon a resolution to remove Banasik at the July 31, 2018 special meeting. Because the parties have stipulated that the act of removal occurred at the July 31, 2018 stockholders meeting, the only issue for decision is whether Justin and James had sufficient votes to remove Banasik from the position to which he had been elected just three weeks earlier.[108]

## C. Stock Ownership

There is no dispute that the Company has, at all times, had 5,000,000 authorized shares of common stock. To determine stock ownership, the first, and frequently the only, source to consult is the stock ledger. The DGCL "implies 'an affirmative duty to maintain a stock ledger'" to which the court may look in

---

[106] PTO ¶ II.8. This was one of two additional stipulated facts that were included in an Amended Joint Pre-Trial Stipulation and Order filed on October 29, 2020, which the court entered that same day. *See* Dkt. 51 & 52.

[107] PTO ¶ II.

[108] *See Boris*, 2013 WL 6331287, at *16 ("Because the parties agreed by pre-trial stipulation that [certain stockholders] were issued the stock reflected on the NC Stock Ledger, the validity of that stock is not in dispute.").

determining stockholders entitled to vote or act by written consent. *Boris*, 2013 WL 6331287, at *13 (quoting *Rainbow Navigation, Inc. v. Pan Ocean Navigation, Inc.*, 535 A.2d 1357, 1359 (Del. 1987)); 8 *Del. C.* § 219(c) ("The stock ledger shall be the only evidence as to who are the stockholders entitled by this section . . . to vote in person or by proxy at any meeting of stockholders."). In this case, however, the Company has no stock ledger and has issued no stock certificates.[109] "[W]hen the stock ledger is blank or non-existent, the Court of Chancery has the power to consider other evidence to ascertain and establish stockholder status." *Rainbow Navigation,* 535 A.2d at 1359; *accord Boris*, 2013 WL 6331287, at *13.

The minutes of the Company's first meeting of the board of directors on October 24, 2012 state that the board authorized the issuance of 4,280,500 shares to Banasik and 719,500 shares to Justin. The minutes also reflect that based upon that issuance, Banasik owned 85.61% of the Company's equity and Justin owned 14.39% of the equity.[110] The original October 24, 2012 stockholder meeting minutes, signed by Justin, show the same share holdings and ownership percentages as the original October 24, 2012 board meeting minutes. I find that as of October 24, 2012, all 5,000,000 shares of Simple Global's authorized stock had been issued and outstanding in the amounts stated in the original minutes of the October 24, 2012

---

[109] Tr. 34 (Banasik); Tr. 93 (Justin).
[110] JX C.

board and stockholders meetings. Figuring out Simple Global's capital structure after that, however, is not so simple.

### 1. The 2013 PLC

The March 21, 2013 PLC is a contract between Banasik and James.[111] In that agreement, James agreed to loan Banasik $50,000. The PLC gave James the right to elect repayment in Simple Global stock held by Banasik. The PLC inaccurately depicted the Company's then-current capital structure. It incorrectly stated that the Company had only 2,000,000 shares issued and outstanding, when in fact there were 5,000,000 shares issued and outstanding. It also incorrectly stated that Banasik owned 1,219,280 or 61% of the outstanding shares. The only reasonable explanation for this obvious mistake is that it was a drafting error.[112] The evidence presented demonstrates that the clear intent of that agreement is reflected in the ownership percentages to be held by each stockholder after Banasik transferred a portion of his Simple Global shares to James to repay the PLC debt.

---

[111] JX E.

[112] *See* Def.'s Pretrial Br. 4 ("[T]he statement of the amount of authorized and allocated shares of [Simple Global] is misstated in the [PLC] as 2,000,000, a difference of 3,000,000 as supported by [the certificate of incorporation and the original minutes of the 2012 and 2013 board and stockholder meetings], and misstates/contradicts prior records as to amount and percentages of Banasik's stock position."); Tr. 121:7-9 (Justin) ("this 2 million amount . . . you know Darius made this document and somehow he had a mistake"); Tr. 139:21-24 (James) ("So my focus was [on Banasik's] 19.52%. I didn't . . . at that time, I didn't look at the 2 million, 5 million thing. And then, you know, that was the main intent of this loan.").

31

If contract language is ambiguous, the court may consider extrinsic evidence to resolve any ambiguity. *Salamone v. Gorman*, 106 A.3d 354, 374 (Del. 2014). Permissible sources of extrinsic evidence include "overt statements and acts of the parties, the business context, prior dealings between the parties, [and] business custom and usage in the industry." *Id.* (internal quotations omitted). "When the terms of an agreement are ambiguous, 'any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement.'" *Sun-Times Media Gp. v. Black*, 954 A.2d 380, 398 (Del. Ch. 2008) (quoting *Restatement (Second) of Contracts* § 202); *see also Julian v. Julian*, 2010 WL 1068192, at *5 (Del. Ch. Mar. 22, 2010) (observing that in search of the parties' intent "courts should consider the parties' course of performance as 'the most persuasive evidence of the [meaning of the] parties' agreement.'") (quoting *Pers. Decisions, Inc. v. Bus. Planning Sys., Inc.*, 2008 WL 1932404, at *6 n.29 (Del. Ch. May 5, 2008) (citing *Restatement (Second) of Contracts* § 202 cmt. g)).

The PLC reflects that after repayment through conversion into equity, Banasik would own 390,332 shares or 19.52%, Justin would own 780,720 shares or 39.04%, and James would own 828,948 shares or 41.45% of the Company's outstanding stock. When the PLC is viewed as the parties intended, with 5,000,000 total outstanding shares, each of the share figures should be multiplied by 2.5. Thus, upon

32

repayment and transfer of shares from Banasik to James, and multiplying the figures in the PLC by 2.5, the share ownership structure would be as follows:

| Stockholder | Shares Owned | % Ownership |
|---|---|---|
| Banasik | 975,830 | 19.52% |
| James | 2,072,370 | 41.45% |
| Justin | 1,951,800 | 39.04% |
| **Total** | **5,000,000** | **100%** |

This is entirely consistent with Banasik's representations to his fellow stockholders and numerous other authorities. Banasik confirmed that "[t]he conversion happened on 3/21/14."[113] The minutes of the March 21, 2014 stockholders meeting state that Banasik transferred shares to James through the loan conversion and that Banasik then owned 19.52% of the total outstanding shares.[114] Thereafter, Banasik told James and Justin,[115] Citizens Bank,[116] and the Internal Revenue Service[117] that he owned 19.52% of the Company's outstanding common stock following the PLC loan conversion repayment.

---

[113] JX J-1.

[114] JX I at 2. These minutes indicate that Banasik transferred 3,304,509 shares to James upon conversion. They also report Banasik owning 975,911 shares. While the share numbers differ from the straightforward calculation of shares derived from the figures in the PLC, I find that the parties intended that Banasik would own 19.52% of the Company's outstanding shares upon conversion.

[115] JX J-6 at 2.

[116] JX J-4.

[117] JX J-2 at 14.

In July 2017, the stockholders approved deferred compensation for each of James, Justin, and Banasik for the years 2012-2016 to be converted into equity.[118] The minutes do not state the actual number of shares held by each stockholder, but they do state that as a result of the stockholders' action, Banasik owned 26% of the outstanding stock, James owned 59%, and Justin owned 15%.[119] The minutes are electronically initialed and signed by all three stockholders using DocuSign. In March 2018, Banasik informed the Company's accountant and its investment banker that Banasik owned 26% of the Company's outstanding common stock, James owned 59%, and there were 1,120,150 shares outstanding.[120] He communicated those same ownership percentages to Citizens Bank in May 2018, attaching minutes of the July 6, 2017 stockholders meeting that he executed with DocuSign.[121] I find by clear and convincing evidence that the parties to the PLC intended that upon repayment, Banasik's stock ownership in the Company would be reduced to 19.52% of the outstanding common stock and that the remaining shares would be owned by James and Justin. I also find, by clear and convincing evidence, that Banasik transferred shares to James on March 21, 2014 pursuant to the PLC and that upon

---

[118] JX K.

[119] *Id.*

[120] JX K-2.

[121] JX K-3. Banasik also incredibly testified that the board and stockholders meeting minutes that refer to Simple Global are inaccurate and were "meant to record the activity . . . of the Korean entity and not the U.S. entity." Tr. 24 (Banasik).

completion of the transfer, Banasik owned 19.52% of the Company's outstanding stock and that, as of that date, James and Justin collectively owned the remaining 80.48%.

Banasik argues that any purported transfer of stock to James under the PLC was statutorily void because the board did not authorize the issuance of those shares to James.[122] This argument is without merit. The PLC is a private contract, and Banasik testified the PLC "is a personal loan agreement with me and James."[123] The Company was not a party, and Banasik acknowledged that he did not sign it on behalf of the Company.[124] The PLC documented the terms of a loan from James to Banasik, for which James could elect to receive repayment in the form of Banasik's Simple Global stock. The contract did not provide for the Company to issue shares. Indeed, the March 21, 2014 stockholders' meeting minutes state that "3,304,509 shares of Darius Banasik [were] transferred to [James] by converting loan amount of $50,000 to shares."[125] Thus, the transfer of shares from Banasik to James pursuant to the terms of the PLC was not a transaction involving the Company's issuance of stock. Therefore, the transaction did not require board action. *Cf. Balin v. Amerimar Realty Co.*, 1996 WL 684377, at *5 (Del. Ch. Nov. 15, 1996) ("Under the Delaware

---

[122] Def.'s Pretrial Br. 19.

[123] Tr. 32 (Banasik).

[124] *Id.*

[125] JX I at 2.

General Corporation Law, the board of directors must formally authorize any issuance of stock by the corporation."); *Box v. Box,* 1996 WL 73575, at *8 (Del. Ch. Feb. 15, 1996) (citing 8 *Del. C.* §§ 141, 152, 153), *aff'd*, 687 A.2d 572 (Del. 1996); *Brandner Corp. v. Stelnick,* 1996 WL 82461, at *7 (Del. Ch. Feb. 22, 1996) (same).

### 2. Banasik's Challenge to His Share Transfer to James Under the PLC Is Barred by the Doctrine of Acquiescence.

The Company argues that Banasik acquiesced to the share transfer to James under the PLC and cannot be heard to challenge that transfer now. To prove acquiescence, the Company must demonstrate that Banasik had full knowledge of his rights and material facts surrounding the transfer of shares to James under the PLC and "'(1) remain[ed] inactive for a considerable time; or (2) freely d[id] what amounts to recognition of the complained act; or (3) act[ed] in a manner inconsistent with the subsequent repudiation, which leads the other party to believe the act has been approved.'" *Nevins v. Bryan*, 885 A.2d 233, 246 (Del. Ch. 2005) (alteration in original) (quoting *Cantor Fitzgerald, L.P. v. Cantor*, 2000 WL 307370, at *24 (Del. Ch. Mar. 13, 2000)). "For the defense of acquiescence to apply, conscious intent to approve the act is not required, nor is a change of position or resulting prejudice." *Klaassen v. Allegro Dev. Corp.*, 106 A.3d 1035, 1047 (Del. 2014). I conclude that Banasik acquiesced to the Company's recognition of Banasik's transfer of 3,304,509

36

of his shares to James and the resulting reduction of his ownership to 975,911 shares, or 19.52% of the Company's outstanding common stock. [126]

Banasik was fully aware of the transfer of his stock to James under the PLC on March 21, 2014 and that the Company acknowledged the transfer. He did not raise any challenge to the stock transfer until asserting his counterclaim in this action on April 1, 2019.[127] In his communications to James, Justin, the Company's accountant, its banker, Citizens Bank, and the IRS, Banasik held himself out as a minority stockholder, thus demonstrating that he freely recognized the act about which he now complains.[128] His conduct in this action is inconsistent with his prior acceptance of the stock transfer under the PLC. His prior conduct led the Company to believe that he had approved and was in full agreement with the share transfer. For example, Banasik swore under penalty of perjury as the Company's president that he owned 19.52% of the Company's outstanding common stock when he signed the Company's 2015 tax return. He disclaimed being a majority stockholder to Citizens Bank in order to avoid signing a personal guarantee on a loan application

---

[126] JX I at 2.

[127] Dkt. 13.

[128] *See* JX J-6 at 2 (June 8, 2017 email to James and Justin attaching a capitalization table reflecting Banasik's minority stockholder status); JX J-4 (January 31, 2017 email to Citizens Bank stating "I am a 19.52% shareholder); JX J-2 at 14 (tax return filed by Banasik indicating that Banasik owns 19.52% of the common stock of Simple Global, Inc.); JX K-2 (email to accountant with capitalization table reflecting minority stockholder status and stating that the same email was to be sent to a bank assisting Simple Global with financing).

that the Company was pursing to obtain financing; instead, he held out James as the majority stockholder and the person obligated to personally guarantee the line of credit. Banasik also informed the Company's banker, which was assisting with efforts to raise equity investment, that it was James, not Banasik, who was the Company's controlling stockholder. Collectively, these acts convincingly demonstrate that Banasik remained inactive for a considerable time, freely did what amounts to recognition of the stock transfer under the PLC, and acted in a manner inconsistent with his belated repudiation of the stock transfer, which led James, Justin, and the Company to believe the act had been approved. Therefore, Banasik acquiesced to the Company's recognition that he had transferred 3,304,509 of his shares to James under the PLC.

### 3.   Banasik's Challenge to His Removal Is Barred by Laches.

Banasik's claims are barred by laches for two separate reasons. First, his direct challenge to his removal as a director is time barred. Second, his indirect effort to invalidate the PLC through his Section 225 claim, which he did not assert until this action, is also barred by laches.

"The equitable defense of laches is based on the theory that upon a person's acquiring knowledge of a wrong affecting his rights, any unreasonable delay in asserting an equitable remedy will bar such form of relief." *Skouras v. Admiralty Enters., Inc.*, 386 A.2d 674, 682 (Del. Ch. 1978) (citations omitted). To prove the

affirmative defense of laches, the Company must show Banasik had knowledge of his rights or his claim, that Banasik unreasonably delayed in asserting his claim, and that "the [Company] or third parties were injured by the delay." *Stengel v. Rotman*, 2001 WL 221512, at *6 (Del. Ch. Feb. 26, 2011).

In assessing a defense of laches, the court normally applies the applicable statute of limitations by analogy. *See Levey v. Brownstone Asset Mgm't, LP*, 76 A.3d 764, 768 (Del. 2013). If the plaintiff asserts its claim after the expiration of the analogous statute of limitations, the delay is presumptively unreasonable. *Id*. "Absent a tolling of the limitations period, a party's failure to file within the analogous period of limitations will be given great weight in deciding whether the claims are barred by laches." *Whittington v. Dragon Group, L.L.C.*, 991 A.2d 1, 9 (Del. 2009). The doctrine of laches also recognizes, however, that a party seeking an equitable remedy may need to assert its rights "with greater alacrity than is required by the analogous statute of limitations to preserve entitlement to relief." *Klaassen v. Allegro Dev. Corp.*, 2013 WL 5739680, at *20 (Del. Ch. Oct. 11, 2013) (quoting *In re Sirius XM S'holder Litig.*, 2013 WL 5411268, at *4 (Del. Ch. Sept. 27, 2013)), *aff'd*, 106 A.3d 1035 (Del. 2014).

In the Section 225 context, even a delay of a month and a half has been held sufficient to bar a claim under the doctrine of laches. *See, e.g., Stengel*, 2001 WL 221512, at *7; *see also Klaassen*, 2013 WL 5739680, at *20 (holding plaintiff's

seven-month delay in challenging his removal was barred by laches). "The reasons for the delay are more critical than the amount of time that has elapsed." *Klaassen*, 2013 WL 5739680, at *20.

Banasik does not claim that he lacked knowledge that he was removed as a director on July 31, 2018, or that he lacked full knowledge of either his rights or material facts. He candidly accepted that he had been removed and "walked away from what was essentially a company that wasn't worth anything."[129] Banasik failed to assert his rights to contest his removal until filing his counterclaim on April 1, 2019, a full eight months after his removal. His only excuse for waiting that long was that he filed his counterclaim in response to the Company's plenary action against him and that he asserted his Section 225 claim as a means to challenge James and Justin's authority to cause the Company to file the plenary action.[130]

The Company has established prejudice resulting from Banasik's unreasonable delay. In the wake of his removal as a director, the Company obtained desperately needed funds through a subscription offer to its stockholders. James subscribed to the offer and made an additional $1,000,000 capital investment in the Company, with the knowledge that Banasik was not a controlling stockholder and

---

[129] Tr. 15 (Banasik).

[130] *See* Dkt. 13, Counterclaims ("Most importantly, the purported authorization of Plaintiff to bring this action against Defendant was not valid.").

40

was no longer a director.  At this late date, a recognition that Banasik is a controlling stockholder, would threaten to "throw [Simple Global] into chaos."  *Klaasen*, 2013 WL 5739680, at *20.  Indeed, Banasik himself acknowledged that his Section 225 claim was both tactical and designed to undo a wide range of corporate action.  *See* Dkt. 13, Counterclaim ¶ 18 ("James Kim's election as a director was not valid. Therefore, all actions taken by [the Company] since the date of his purported election as a director that would have required director approval, but were not consented to by Defendant, are not the properly authorized actions of Plaintiff."); *id*. ¶ 19 ("Various other actions of [the Company] subsequent to James Kim's purportedly becoming a majority shareholder and director—including but not limited to the purported issuance of additional shares of Plaintiff's stock supposedly diluting Plaintiff's equity position even further—were not valid. Most importantly, the purported authorization of Plaintiff to bring this action against Defendant was not valid.").  Had Banasik complained of his removal sooner, the Company could have sought to file its own Section 225 action to confirm his removal.  *See Stengel*, 2001 WL 221512, at *7 (holding Section 225 claim was barred by laches where plaintiff's challenge was "purely [a] tactical move designed to preserve the value of any claim for back pay his client may possess").  Banasik's Section 225 claim is barred by laches.

Banasik's challenge to the transfer of his stock under the PLC—the linchpin of his case—is also barred by laches. His challenge to the PLC is one sounding in contract. The analogous statute of limitations is 10 *Del. C.* § 8106, under which a breach of contract action must be brought within three years from the date that the cause of action accrued. *Levey*, 76 A.3d at 768. The transfer of shares under the PLC occurred on March 21, 2014.[131] Thus, under the analogous statute of limitations, Banasik was required to assert his challenge to the transfer of shares under the PLC no later than March 21, 2017. Banasik did not assert his challenge to the share transfer under the PLC until the filing of his counterclaims on April 1, 2019. Accordingly, Banasik's delay is presumptively unreasonable and prejudice is presumed. *See Sirius XM*, 2013 WL 5411268, at *4 ("After the statute of limitations has run, [the Company is] entitled to repose and [is] exposed to prejudice as a matter of law by a suit by a late-filing plaintiff who had a fair opportunity to file within the limitations period."); *Baier v. Upper New York Investment Co. LLC*, 2018 WL 1791996, at *12 (Del. Ch. Apr. 16, 2018) (same); *see also Kraft v. WisdomTree Invs., Inc.*, 145 A.3d 969, 979 (Del. Ch. 2016) (analyzing the application of laches in various contexts).[132] Accordingly, Banasik's indirect challenge to the PLC and resulting share transfer is time barred.

---

[131] *See* JX I at 2; JX J-1; Tr. 42 (Banasik).

[132] The Company has also established prejudice as discussed in the preceding paragraph.

### 4. The Banasik Loan Did Not Convert into Simple Global Equity.

Banasik argues that if the PLC resulted in the transfer of his Simple Global shares to James, then the "two loans should have essentially offset each other as to share ownership, leaving Banasik in the established initial position as majority shareholder."[133] This argument fails for two reasons. First, Banasik admitted that he had not been repaid for the Banasik Loan in either stock or cash.[134] Second, unlike the PLC, which is a private contract between Banasik and James, the Banasik Loan agreement is between Banasik and the Company. Any repayment to Banasik in the form of Simple Global stock would require the issuance of shares and, therefore, board action. *Balin*, 1996 WL 684377, at *5 ("Under the Delaware General Corporation Law, the board of directors must formally authorize any issuance of stock by the corporation."); *Box,* 1996 WL 73575, at *8 (citing 8 *Del. C.* §§ 141, 152, 153); *Brandner*, 1996 WL 82461, at *7 (same). Therefore, Banasik did not own a majority of the Company's outstanding stock by virtue of the Banasik Loan agreement.

---

[133] Def.'s Post-Tr. Reply Br. 8.

[134] Tr. 42 (Banasik).

### 5. How Many Shares Are Issued and Outstanding?

After the transfer of shares from Banasik to James under the PLC, Banasik owned only 19.52% of the Company's common stock. A much more confounding question is how many shares did he own at the time of his purported removal from the board on July 31, 2018? The answer to that question turns on the answer to two other questions. First, were all 5,000,000 of the Company's authorized shares issued and outstanding on July 31, 2018? Second, did the Company validly reduce the number of outstanding shares from 5,000,000 to 1,000,000? The Company contends that all of the directors and stockholders (*i.e.*, James, Justin, and Banasik) agreed in 2017 to "clean up the cap table" in order to raise additional funds through debt or equity. The board and stockholders were concerned that confusion over the capital structure would inhibit the Company's ability to attract investors. The evidence clearly and convincingly shows that all three stockholders and directors in 2017 *intended* that the Company would reduce the total number of outstanding shares from 5,000,000 to 1,000,000.[135]

Although I find that the Simple Global board and stockholders intended to reduce the number of the Company's outstanding shares from 5,000,000 to 1,000,000, it is not readily apparent from the trial evidence that the board and

---

[135] *See, e.g.*, JX J-6; Tr. 94 (Justin).

stockholders did so in compliance with Delaware law.[136]  For purposes of this opinion, however, I need not decide whether the Simple Global board and stockholders reduced the number of issued and outstanding shares from 5,000,000 to 1,000,000 in compliance with Delaware law.  Regardless of whether the Company had 5,000,000 or 1,000,000 issued and outstanding shares on July 31, 2018, James and Justin owned a majority of the Company's outstanding shares entitled to vote in an election of directors on that date and validly removed Banasik as a director.[137]

---

[136] Section 242(a)(3) of the DGCL provides that "a corporation may amend its certificate of incorporation . . . to "subdivid[e] or combin[e] the outstanding shares . . . into a greater or lesser number of shares."  If the Simple Global board and stockholders intended to effect a reverse stock split under Section 242(a)(3), then a certificate amendment would have been required.  *See Blades v. Wisehart*, 2010 WL 4638603, at *8 n.66 (Del. Ch. Nov. 17, 2010) ("'The final clause of Section 242(a)(3) was added by amendment in 1996 to make clear that an amendment of the certificate of incorporation is necessary in order to effect a forward stock split.'" (quoting 1 R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations and Business Organizations* § 8.4 n.35 (3d ed. 2009)); 1996 Del. Laws Ch. 349, Synopsis (observing that amendments to Section 242(a) and 242(a)(3) "make clear that an amendment to the certificate of incorporation is necessary in connection with a forward or reverse stock split"); *see also Boris*, 2013 WL 6331287, at *16 ("The . . . board may well have informally decided to issue stock, and the directors and purported stockholders may have conducted themselves as if the stock had been issued.  But, even a shared understanding of what was intended is insufficient to satisfy the DGCL's strict requirement of a written instrument [to issue stock].").  There is no evidence in the record that the board and stockholders effected an amendment to the Company's certificate of incorporation in accordance with Section 242(a)(3) of the DGCL.

[137] Because I find that Banasik was validly removed even if he is correct that all 5,000,000 shares were issued and outstanding at the time of his removal, I do not reach the Company's arguments that Banasik acquiesced to or is estopped from challenging the reduction in shares from 5,000,000 to 1,000,000.  *See* Pl.'s Answering Post-Tr. Br. 20–24; *cf. STAAR Surgical Co. v. Waggoner*, 558 A.2d 1130, 1137 (Del. 1991) (holding stock not issued in compliance with the DGCL is void and not subject to equitable defenses (citing *Waggoner v. Laster*, 581 A.2d 1127 (Del. 1990)); *accord Boris*, 2013 WL 6331287, at *14 (citing cases); *Superwire.com, Inc. v. Hampton*, 805 A.2d 904, 909 n.17 (Del. Ch. 2002) (rejecting

If, as the Company contends, it had validly reduced the number of outstanding shares from 5,000,000 to 1,000,000, then, as the record shows, Banasik owned either 19.52% or 26% of the outstanding shares, with James and Justin owning the remainder. Under that scenario, James and Justin still had a majority of the outstanding shares, and sufficient votes to remove Banasik as a director on July 31, 2018.

On the other hand, if, as Banasik contends, the Company at all times had 5,000,000 issued and outstanding shares, he would fare no better. Assuming for purposes of this decision that Banasik is correct, then the Company was without authority to issue any additional shares after the initial issuance of all 5,000,000 authorized shares on October 24, 2012.[138] Upon repayment of the PLC loan to James, Banasik transferred 3,304,509 of his shares to James, reducing Banasik's ownership to 975,911 shares, or 19.52% of the Company's outstanding common stock.[139] Thus, as of the March 21, 2014 stock transfer, James and Justin collectively owned 80.48% of the Company's outstanding common stock. Because the Company could not issue any more shares,[140] and there is no evidence that James or

equitable defenses on the grounds that the court "cannot give *any* effect to void shares even in the context of an equitable defense" (emphasis in original)).

[138] JX C.

[139] JX I.

[140] *See Liebermann v. Frangiosa*, 844 A.2d 992, 1009 (Del. Ch. 2002) (finding preferred stock sold to investors, including board members, to be invalid because the issuance

Justin had transferred any of their shares to Banasik, at the time of the July 31, 2018 special meeting of stockholders, James and Justin owned a sufficient number of shares to remove Banasik as a director.

Banasik's walking away from the Company after his removal as an officer in June 2018 and his removal as a director in July 2018 is inconsistent with what would be expected from someone who owns, or believes he owns, a majority of the Company's outstanding stock. He did not object to his removal as an officer or director when those events occurred, and he did not initiate litigation to contest his removal. Indeed, he was seemingly satisfied with having been removed until the Company instituted litigation against him.

There is not a single document in the trial record evidencing that Banasik, or anyone else for that matter, believed that Banasik owned a majority of Simple Global's outstanding stock at any time after March 21, 2014. Indeed, the overwhelming evidence shows that he did not, and Banasik's conflicting trial testimony to the contrary was not credible.

exceeded the number of shares authorized in the certificate of incorporation). The parties have not raised, and the court does not consider, whether any purported issuance of shares beyond the 5,000,000 authorized in the certificate could be ratified or validated under 8 *Del. C.* §§ 204 or 205.

## III. CONCLUSION

For the reasons discussed above, the court finds that Banasik was validly removed as a director of Simple Global at the July 31, 2018 special meeting of stockholders by a vote of the majority of the Company's outstanding shares, which were held by James and Justin. An implementing order pursuant to Court of Chancery Rule 54(b) is entered simultaneously herewith.